# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA
# EASTERN DIVISION

No. 4:14-CV-00076-FL

| | |
|---|---|
| JOSEPH WAYNE HARDISON, | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| | ) **MEMORANDUM AND** |
| v. | ) **RECOMMENDATION** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-23, -25] pursuant to Fed. R. Civ. P. 12(c). Claimant Joseph Wayne Hardison ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of his applications for a period of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be denied, Defendant's Motion for Judgment on the Pleadings be allowed, and the final decision of the Commissioner be upheld.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability, DIB and SSI on December 30, 2010, alleging disability beginning June 1, 2010. (R. 10, 255). Both claims were denied initially and upon reconsideration. (R. 89-90, 155-56). A hearing before the Administrative Law Judge ("ALJ") was held on December 21, 2012, at which Claimant, represented by counsel, and

a vocational expert ("VE") appeared and testified. (R. 29-46). On February 1, 2013, the ALJ issued a decision denying Claimant's request for benefits. (R. 7-28). Claimant then requested a review of the ALJ's decision by the Appeals Council (R. 6), and submitted additional evidence as part of his request (R. 781-83). After reviewing and incorporating the additional evidence into the record, the Appeals Council denied Claimant's request for review on April 14, 2014. (R. 1-5). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence

2

and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520, 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id*. At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id*.

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c) and 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id*. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id*. §§ 404.1520a(e)(3), 416.920a(e)(3).

In this case, Claimant alleges the following errors by the ALJ: (1) finding Claimant's physical

3

and mental impairments do not meet or medically equal Listings 1.04, 12.04, and 12.06; (2) finding

Claimant has the RFC to perform a limited range of light work; and (3) failing to give controlling

weight to the opinion of Claimant's treating physician, Dr. Amy Shipley. Pl.'s Mem. [DE-24] at 19-

28.

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not

disabled" as defined in the Act. At step one, the ALJ found Claimant has not engaged in substantial

gainful activity since the alleged onset date. (R. 12). Next, the ALJ determined Claimant has the

following severe impairments: cervical degenerative disc disease, minimal lumbar degenerative disc

disease, a mood disorder, anxiety disorder, substance dependence, and hypertension. *Id.* However,

at step three, the ALJ concluded these impairments were not severe enough, either individually or

in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1. *Id.* Applying the technique prescribed by the regulations, the ALJ found

that Claimant's mental impairments have resulted in mild restrictions in his activities of daily living,

moderate difficulties in social functioning and concentration, persistence and pace, and no episodes

of decompensation, which have been of an extended duration. (R. 13).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the

ability to perform a limited range of light work, requiring him to lift, carry, push and pull 20 pounds

occasionally and 10 pounds frequently; sit for six hours and stand or walk six hours in an eight-hour

workday; have a sit/stand option allowing him to change from sitting to standing every 30 minutes;

only occasionally reach overhead with his right upper extremity; and frequently stoop, crouch, kneel,

4

and crawl.[1] (R. 14). Due to Claimant's decrease in the ability to concentrate on and attend to work tasks, the ALJ further limited Claimant to simple, routine, repetitive tasks (i.e., apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form and deal with problems involving several concrete variables in or from standardized situations); only occasional interaction with coworkers, supervisors, and the public; and no complex decision making, constant change, or dealing with crisis situations. *Id.* In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 22). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of his past relevant work as a heavy equipment operator. *Id.* Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 23-24).

## B.     Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing he was 49 years old and lived with his wife and ten-year-old son. (R. 33). Claimant's twenty-six-year-old daughter provides Claimant with some income support. (R. 42). Claimant is 5 feet 9 inches tall and weighed 200 pounds at the time of his hearing. (R. 33). His weight fluctuates and was as low as 155 pounds when he was most ill. *Id.* Claimant attained an eighth grade education with no vocational or other secondary training. *Id.* Claimant worked his entire career until 2008 as a heavy equipment operator, which included

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. §§ 404.1567(b), 416.967(b).

performing duties such as pipe, manhole, and cement work. (R. 34). He lifted, with the assistance of another, pipe and manhole covers weighing over 100 pounds. *Id.*

Claimant explained numerous medical conditions supporting his disability claim and inability to work. In 2010, Claimant experienced numbness in his right arm, which resulted in Claimant undergoing two surgeries on the back of his neck in September and December of 2011. (R. 35). Prior to the surgeries, Claimant could not lift with his right arm, but the problem was corrected for the most part. *Id.* Claimant also experiences back pain daily. (R. 34-35, 37). His primary physician referred him to a pain management clinic and he has received approximately 20 shots in his back. (R. 35). After a procedure where Claimant was administered a new medication through six needles in his back, he required hospitalization due to pain. (R. 36). He then began seeing his current doctor who restarted him on medication. *Id.* Claimant also consulted a physical therapist, but did not receive treatment because the therapist was concerned about injuring the plates and screws in Claimant's neck. *Id.* In addition to taking pain medication, Claimant attempts to alleviate his back pain by changing positions (e.g., moving from the couch to the bed or walking to the mailbox), but finds only medication to be helpful. (R. 37). Claimant has experienced insomnia for more than three years and was diagnosed with restless leg syndrome. *Id.* He takes medication, Klonopin or Clonazepam, that allows him to get two and a half to three hours of sleep each night and also helps keep him from shaking. *Id.* Claimant also tried taking several different antidepressants but his condition worsened. (R. 37-38).

Claimant spends most of his day lying in bed or on the couch and has little energy to participate in activities with his wife and son. (R. 37-38). He used to fish and play ball with his son, but is no longer able to do those things and engages in no social activities. (R. 41-42). In the

6

morning Claimant gets up and tries to get his son ready for school, cooking his breakfast and making his lunch, and ensuring he gets on the school bus. (R. 40). He then has to sit down, so he takes his medicine and watches television. *Id.* Sometimes Claimant tries to do yard work, but his wife does it for the most part. (R. 41). He also tries to help her do the dishes and fold the laundry. *Id.* Claimant has a driver's license, but does not drive often, going to the grocery store twice a week. (R. 33). He can only stand for 20 to 25 minutes at a time before needing to sit down due to swelling in his legs and feet. (R. 38). After sitting for a approximately 15 minutes, Claimant must change positions or stand and is never comfortable. (R. 38-39). Claimant's doctors discussed exercising with him, and he once walked to a bridge approximately a quarter mile from his house, but his ankles swelled so badly that he was concerned he would not make it back. (R. 39). Claimant does not believe he can lift 15 pounds for fear of pulling out the screws and plates in his neck, and his doctor advised him not to lift more than ten pounds. *Id.*

Claimant experiences memory loss and has difficulty with concentration and focus. (R. 40). If his wife sends him to the store to pick something up, he has to call her when he arrives to remind him what he is supposed to buy. *Id.* He also confused the numbers for his bank and food cards and must write down absolutely everything. *Id.* Claimant experiences anxiety from not being able to work and provide for his family. (R. 41).

## C. Vocational Expert's Testimony at the Administrative Hearing

Julie Sawyer-Little testified as a VE at the administrative hearing. (R. 43). After the VE's testimony regarding Claimant's past work experience, the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant and posed the following hypothetical: whether the individual could perform Claimant's past relevant work

7

assuming the individual has the physical capacity to perform light work, standing, walking, and sitting up to six hours in an eight-hour day with a sit/stand option, which would allow changing from sitting to standing approximately every 30 minutes; lifting, carrying, pushing and pulling 20 pounds occasionally and ten pounds frequently; occasional reaching overhead with the right upper extremity; no more than frequent stooping, crouching, kneeling and crawling; simple routine repetitive tasks, meaning that one could apply common sense, understanding and carry out instructions furnished in written, oral or diagrammatic form; deal with problems involving several concrete variables or from standardized situations; occasional contact with co-workers, supervisors and the public; and is unable to work at jobs requiring complex decision-making, constant change or crisis situations. (R. 43-44). The VE responded in the negative, but opined that such an individual could perform the occupations of mail sorter, Dictionary of Occupational Titles ("DOT") number 209.687-026, light, and SVP of 2; office helper, DOT number 239.567-010, light, and SVP of 2; and photocopy machine operator, DOT number 207.685-014, light, and SVP of 2. (R. 44). The VE indicated her testimony was consistent with the DOT except with respect to her testimony regarding the sit/stand option, which is not addressed by the DOT, but rather is based on her opinion formed from a combination of factors, including her training and education, consultation work, job facts analysis, and listening to testimony as to how work is performed. *Id.*

Claimant's counsel asked the VE whether the hypothetical individual could perform substantial gainful activity if off task more than 20 percent of the day, and the VE responded in the negative. (R. 45). Counsel next asked the VE to add to the ALJ's hypothetical the restriction of reclining or propping up the legs for four hours in an eight-hour work day, and the VE opined that such a restriction would preclude the above-listed occupations. *Id.* Counsel further inquired whether

8

a hypothetical individual that could lift only ten pounds occasionally, sit less than two hours in an eight-hour day, alternate sitting and standing, only occasionally climb, balance, kneel, crawl, and never stoop would be able to perform any jobs, and the VE responded in the negative. *Id.* Counsel indicated that the final hypothetical reflected the limitations included in the medical source statement of Claimant's treating physician. *Id.*

## V. DISCUSSION

### A. The ALJ's Consideration of Listings 1.04, 12.04, and 12.06

Claimant first contends the ALJ erred in finding that Claimant's physical and mental impairments do not meet or equal Listings 1.01, 12.04, and 12.06. Pl.'s Mem. [DE-24] at 19-23. The Commissioner contends that substantial evidence supports the ALJ's listings determination. Def.'s Mem. [DE-26] at 17-21.

To show disability under the listings, a claimant may present evidence either that the impairment meets or is "medically equivalent" to a listed impairment. *See Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986); 20 C.F.R. §§ 404.1526, 416.926 (regulations for determining medical equivalence). "The [ALJ] . . . is responsible for deciding . . . whether a listing is met or equaled." S.S.R. 96-6p, 1996 WL 374180, at *3 (July 2, 1996). In order to determine whether a medical impairment equals a listing, the ALJ is bound to "consider all evidence in [claimant's] case record about [the] impairment(s) and its effects on [claimant] that is relevant to this finding. . . . [The ALJ] also consider[s] the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. §§ 404.1526(c), 416.926(c). "For a claimant to qualify for benefits by showing that his . . . combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most

9

similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531. "Plaintiffs bear the burden of proving their condition meets a listing and, accordingly, the responsibility of producing evidence to sustain their claims." *Rowe v. Astrue*, No. 5:07-CV-478-BO, 2008 WL 4772199, at *1 (E.D.N.C. Oct. 28, 2008) (unpublished) (citing *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995)). Thus, where a claimant "fails to articulate why h[is] medical impairments do, in fact, meet all of the elements of a given listed impairment," he fails to meet his burden. *Id.* (citing *Sullivan*, 493 U.S. at 530).

## 1. Listing 1.04, Disorders of the Spine

Listing 1.04 refers generally to disorders of the spine, such as spinal stenosis, osteoarthritis and degenerative disc disease, resulting in the compromise of a nerve root or the spinal cord. 20 C.F.R. § 404, Subpt. P., App. 1 ("Listing") § 1.04. In order to meet Listing 1.04, a claimant must demonstrate one of the following:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

. . . .

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.* § 1.04A; *see Drotar v. Colvin*, No. 7:13-CV-265-FL, 2015 WL 965626, at *5 (E.D.N.C. Mar. 4,

10

2015) (unpublished) (discussing the criteria to meet or equal Listing 1.04).

The ALJ concluded "[t]he record does not show that the claimant has a spinal disorder characterized by nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis, as required by Medical Listing 1.04." (R. 13). Claimant contends he suffers from "cervical degenerative disc disease, a large herniated disc causing mass effect on the nerve root, spinal stenosis, lumbar spondylosis, decreased range of motion in the spine, a shuffling gait resulting from back pain, an annular tear, disc protrusion, cervical radiculopathy, chronic back pain, bilateral leg numbness, neuralgia, neuritis, radiculitis, and lumbar degenerative disc disease." Pl.'s Mem. [DE-24] at 20. Claimant also points to the following objective evidence: a May 18, 2011 MRI indicating a moderately severe right foraminal protrusion at C5-6 with mass effect on the right C6 nerve root, as well as moderate left foraminal stenosis at C6-7, *id.* (citing R. 355-60); an April 12, 2012 MRI indicating lumbar spondylosis, disc protrusion, and an annular tear, *id.* (citing R. 731); and positive straight leg raise tests on November 15 and December 11, 2015, the latter accompanied by a shuffling gait, *id.* at 21 (citing R. 753-57, 758-61). The Commissioner asserts there are no references to lumbar spinal stenosis in the record and while the November 2011 MRI showed material that might be compressing the nerve root, after Claimant's foraminotomy in December 2011, a July 2012 MRI shows no nerve root compression. Def.'s Mem. [DE-26] at 18 (citing R. 478, 604). A review of the medical records substantiates the ALJ's conclusion that Claimant's back impairments do not meet or equal Listing 1.04.

Several treatment notes from Claimant's primary care providers indicate his radiculopathy causing right shoulder and arm pain throughout 2011 was completely resolved after his second surgery on December 2, 2011. (R. 566) (Dec. 13, 2011 - right arm pain completely resolved and

11

advising to stop taking pain medication); (R. 565) (Jan. 10, 2012 - right arm pain has been resolved). Claimant did not begin experiencing chronic low back pain until late December 2011. (R. 661). Despite earlier MRIs indicating moderately severe right foraminal protrusion at C5-6 with mass effect on the right C6 nerve root (related to the radiculopathy), moderate left foraminal stenosis at C6-7, and lumbar spondylosis, disc protrusion, and an annular tear (R. 355, 731), a subsequent July 23, 2012 treatment note from Dr. Michael Sharts, Claimant's neurosurgeon, indicates Claimant's MRI was "fairly normal" with no nerve root compression or degenerative disc disease:

[Claimant] had good resolution of his cervical radiculopathy from his posterior cervical foraminotomy. He comes today really for low back pain. He has had an MRI that is fairly normal with just mild degenerative changes in his lumbar spine, but *absolutely no nerve root compression. No instability. Really not even a degenerative disk disease*. He has no abnormal motion on flexion or extension, so right now I do not any surgery [sic] would be of benefit for him. I have recommended he continue his pain management and conservative therapies.

(R. 604) (emphasis added).

The ALJ cited Dr. Sharts's treatment note when considering Claimant's back pain in the RFC analysis and also cited an August 20, 2012 treatment note from one of Claimant's primary care providers concluding that Claimant's back pain was out of proportion to objective findings, declining to prescribe pain medicine, and recommending measures other than narcotic pain medications, which Claimant refused. (R. 18, 681-85); *see also* (R. 592-93) (Aug. 15, 2012 treatment note from referral to pain management clinic indicating Claimant's pain was out of proportion with imaging studies and recommending conservative measures). The ALJ cited treatment notes from Claimant's primary care providers throughout 2012 indicating Claimant had negative straight leg raise tests, normal range of motion, normal station and gait, and no difficulty ambulating. (R. 17-18, 594-95, 657, 692, 707-08, 714-15). The ALJ also noted Claimant's treatment providers declined on several occasions

12

Case 4:14-cv-00076-FL   Document 30   Filed 07/21/15   Page 12 of 32

to prescribe him the narcotic medication he requested due to lack of objective findings and a past history of narcotics abuse. (R. 17-18, 592-93, 681-85, 689-93, 695-99, 700-02, 706-09, 713-16). Furthermore, while Dr. Shipley's treatment notes from November and December 2012 and letter of March 27, 2013 indicate Claimant was ambulating independently with a "somewhat shuffling" gait and a straight leg raise triggered dull low back pain, they do not establish the presence of nerve root compression, stenosis, or equivalent findings equal in severity. (R. 757, 760, 783). Accordingly, while there is some evidence in the medical records that Claimant at one time may have experienced nerve root compression and stenosis, subsequent post-surgical medical records indicate a relatively normal MRI and provide substantial evidence to support the ALJ's finding that Claimant's back impairment does not meet or medically equal Listing 1.04.

## 2. Listing 12.04, Affective Disorders and Listing 12.06, Anxiety-Related Disorders

Listing 12.04 generally addresses disorders such as depression, mania, and bipolar disorder, and Listing 12.06 addresses anxiety-related disorders. Listing 12.04 is satisfied if an individual meets the A and B criteria, or if he meets the C criteria. The A criteria require medically documented persistence of depressive syndrome, manic syndrome, or bipolar syndrome, each meeting various requirements, and the C criteria require a medically documented history of a chronic affective disorder of at least two years' duration, again meeting various requirements. Listing 12.04A, C. Listing 12.06 is satisfied if an individual meets the A and B criteria or the A and C criteria. The A criteria require, subject to additional specific requirements, medically documented findings of generalized persistent anxiety, a persistent irrational fear, recurrent severe panic attacks, recurrent obsessions or compulsions, or recurrent and intrusive recollections of a traumatic experience. Listing 12.06A. The C criteria require the complete inability to function outside the area

13

of one's home as a result of a condition in paragraph A. Listing 12.06C. The B criteria, which are identical for both listings, require marked restrictions in two of the following areas: activities of daily living; social functioning; concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Listings 12.04B, 12.06B. For the first three functional areas, the ratings in order of increasing level of limitation are none, mild, moderate, marked, and extreme. Listing 12.00C1-3; 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4) The last functional area—repeated episodes of decompensation, each of extended duration—means three episodes within one year or an average of one every four months, each lasting at least two weeks. Listing 12.00C4.

The ALJ concluded that "[t]he severity of claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.09," finding that neither the B nor C criteria were satisfied. (R. 13). Specifically, with respect to the B criteria, the ALJ found Claimant's mental impairments have resulted in only mild restrictions in his activities of daily living, moderate difficulties in social functioning and concentration, persistence and pace, and no episodes of decompensation, which have been of an extended duration. (R. 13). With respect to the C criteria, the ALJ found no evidence of repeated episodes of decompensation or a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause decompensation, or a current history of one or more years' inability to function outside a highly supportive living arrangement, with a continued need for such an arrangement. *Id.*

Claimant contends that with respect to Listing 12.04 the record demonstrates he has "consistently suffered from anhedonia and loss of interest in activities he previously enjoyed,

14

appetite disturbances resulting in weight loss, insomnia, psychomotor agitation and retardation, low energy, feelings of guilt and worthlessness, and poor concentration" and that "[t]his combination of symptoms should result in plaintiff meeting and/or equaling the functional equivalent of the listing." Pl.'s Mem. [DE-24] at 21-22. With respect to Listing 12.06, Claimant contends he has "a medically documented history of anxiety disorder, characterized by generalized persistent anxiety and motor tension" and that "[t]his combination of symptoms should result in the plaintiff meeting and/or equaling the functional equivalent of the listing." *Id.* at 22. Specifically addressing the B criteria, Claimant asserts that with respect to activities of daily living his wife does most of the yard work and house work because he is unable to help her, with respect to social functioning he has been unable to maintain previous friendships or participate in activities he used to enjoy with his son, and with respect to concentration, persistence, and pace he has difficulty concentrating and is unable to remember things without writing them down. *Id.* at 22-23. Finally, Claimant contends that he has been routinely treated for his mental impairments since February 2009 with antidepressants, anti-anxiety medication, sleep aids, and psychotherapy, but has required multiple emergency department visits due to insomnia lasting three to four days and continues to experience other symptoms as a result of his mental impairments. *Id.* at 23. The Commissioner contends the ALJ's determination is supported by substantial evidence in the record. Def.'s Mem. [DE-26] at 19-20. A review of the medical records substantiates the ALJ's decision that Claimant's mental impairments do not meet or equal Listings 12.04 and 12.06.

Claimant's argument appears to challenge the ALJ's conclusion with respect to the B criteria alone. Pl.'s Mem. [DE-24] at 21-23. The ALJ's determination that Claimant lacked the requisite marked restrictions in two of the relevant areas—activities of daily living, social functioning, and

15

concentration, persistence and pace—is supported by record evidence cited in the ALJ's RFC analysis.[2] The ALJ acknowledged that beginning in 2009, after being laid off from his job, Claimant expressed symptoms of depression and anxiety with a number of related symptoms, such as insomnia, lack of concentration and energy, agitation, and decreased activity. (R. 20-22). However, the ALJ also noted Claimant at other times: denied depressive symptoms (R. 440, 469, 528), had mental status examinations within normal limits (R. 331, 452-53, 622, 627, 733, 760), stopped taking Cymbalta after indicating it helped his mood (R. 704, 713-15, 728), declined other antidepressant medications and psychotherapy (purportedly because they did not work)[3] (R. 501-03, 695-96, 765), was not interested in learning relaxation and pain coping skills (R. 765), was assessed a Global Assessment Functioning Score ("GAF") of 55[4] (R. 321-23), and never required psychiatric hospitalization (R. 733). (R. 20-22). The ALJ also relied on the opinion of a consulting state agency

_____

[2] In evaluating whether a claimant meets or equals a listing, the court is not limited to the ALJ's discussion at Step 3 and may also consider the ALJ's decision as a whole, including the RFC discussion. *See Drotar*, 2015 WL 965626, at *4 (citing *Russell v. Chater*, No. 94-2371, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (per curiam) (unpublished) & *Green v. Chater*, No. 94-2049, 1995 WL 478032 (4th Cir. Aug.14, 1995) (per curiam) (unpublished)).

[3] One of Claimant's psychiatric care providers noted on October 10, 2011, that Claimant reported "taking 9 antidepressants last year, but was unable to name them" and that she called Claimant's pharmacy but it had no record of such. (R. 628).

[4] The GAF scale measures a person's overall psychological, social, and occupational functioning. Am. Psych. Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM"), 32 (4th ed. text rev. 2000). A GAF in the range of 51–60 indicates, "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)" and a score in the range of 61–70 indicates, "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34. The Social Security Administration has been clear that GAF scores do not "have a direct correlation to the severity requirements in [the social security] mental disorders listings." *Wiggins v. Astrue*, No. 5:11-CV-85-FL, 2012 WL 1016096, at *8 (E.D.N.C. Feb. 2, 2012) (unpublished) (citations and internal quotation marks omitted), *adopted by* 2012 WL 1016055 (E.D.N.C. Mar. 22, 2012). Additionally, the GAF scale was dropped from the DSM-V due, in part, to its "conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) . . . ." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 16 (5th ed. 2013). Even so, the ALJ must consider a claimant's GAF score along with all of the record evidence. *Atkinson v. Astrue*, No. 5:10-CV-298-FL, 2011 WL 3664346, at *11 (E.D.N.C. July 20, 2011) (unpublished), *adopted by* 2011 WL 3664858 (E.D.N.C. Aug. 17, 2011) (quotations omitted).

16

psychological consultant, who determined that while Claimant was no more than moderately limited in each of the criteria B categories. (R. 22, 130-36, 147-52). The ALJ cited ample evidence to support his conclusion that Claimant was not markedly restricted by his mental impairments in two of the relevant areas.

In addition to the evidence cited by the ALJ, the record further indicates Claimant was assessed with a GAF of 55 or greater on other occasions and his symptoms were characterized as "mild" with a "mild" level of functional impairment. (R. 450-53) (Sept. 12, 2009 - GAF 60-70); (R. 621-23, 626-28) (Oct. 10, 2011 and Jan. 10, 2012 - GAF 60 and "mild" depressed mood, decreased energy, anxiety, and functional impairment); (R. 644-49) (July 1, 2011 - GAF 55); (R. 732-34) (Jan. 25, 2012 - GAF 55, diagnosing dependence on opiates, anxiety medication, cannabis, and nicotine and finding primary cause of mood disturbance is related to substances). With respect to Emergency Department ("ED") visits related to Claimant's insomnia, they appear attributable to his attempts to obtain medication when he ran out. (R. 446-64) (Sept. 7, 2009 - ED visit related to insomnia where Claimant noted he was previously taking Valium and Xanax to help him sleep and had recently been taking other people's medications); (R. 468-71) (Nov. 9, 2009 - ED visit related to insomnia where noted Valium was effective but Claimant was currently out); (R. 474-76) (Dec. 6, 2009 - ED visit related to insomnia where noted Claimant was previously administered Valium but ran out). Finally, there is some indication in the record that Claimant engaged in a greater level of daily activity than his testimony suggests. (R. 439) (Oct. 24, 2010 - ED visit due to Claimant twisting his ankle playing basketball); (R. 713) (Mar. 13, 2012 - Claimant reported to his treating physician that he was feeling better regarding his depression and had been "working some odd jobs lately"); (R. 772) (Sept. 21, 2012 - ED visit due to Claimant twisting his back hauling a heavy branch

17

while doing yard work). Accordingly, there is substantial evidence in the record to support the ALJ's determination that Claimant's mental impairments were not markedly limiting as required to meet or medically equal Listings 12.04B and 12.06B.

**B. The ALJ's Analysis of the Opinion Evidence**

Claimant contends the ALJ erred in failing to give controlling weight to the opinion of Claimant's treating physician, Dr. Amy Shipley, who opined Claimant can lift and carry no more than ten pounds and can stand for less than two hours in a workday, restrictions inconsistent with the ALJ's RFC determination that Claimant can engage in a limited range of light work. Pl.'s Mem. [DE-24] at 26-28. The Commissioner contends the ALJ evaluated Dr. Shipley's opinion in accordance with the regulations and case law and appropriately discounted Dr. Shipley's opinion because it was inconsistent with the weight of the record. Gov't's Mem. [DE-26] at 23-25. A review of the record indicates the ALJ appropriately evaluated Dr. Shipley's opinion and his reasons for giving it little weight are supported by substantial evidence.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Additionally, more weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig*, 76 F.3d at 590 (quotations & citations omitted). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other

18

substantial evidence, it should be accorded significantly less weight." *Id.*; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all of the medical opinions in the record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at \*8 (W.D. Va. Sept. 5, 2006) (unpublished), he must nevertheless explain the weight afforded such opinions. *See* S.S.R. 96-2p, 1996 WL 374188, at \*5 (July 2, 1996); S.S.R. 96-6p, 1996 WL 374180, at \*1 (July 2, 1996). An ALJ may not reject medical evidence for the wrong reason or no reason. *Wireman*, 2006 WL 2565245, at \*8.

The opinion at issue is a December 11, 2012 Medical Source Statement completed by Dr. Shipley, in which she indicates Claimant is limited to lifting and carrying no more than ten pounds, standing for less than two hours in an eight-hour workday, and must alternate periodically between sitting and standing. (R. 749-52). Dr. Shipley states Claimant experiences significant pain with these activities. (R. 751). Dr. Shipley also imposes certain postural limitations, including no stooping. (R. 750). Dr. Shipley states that her opinion is based on her observations while examining

19

Claimant that he "moved about the room" and "changed from sitting to standing to lying down to get more comfortable," citing a treatment note of the same day. (R. 750). The December 11, 2012 treatment note indicates Dr. Shipley saw Claimant to establish care for chronic back pain for which he had seen multiple providers over several years with little improvement. (R. 753). Claimant complained of low back pain, sharp at times and dull persistently, made worse by walking, standing, stooping, bending, and staying in one position for too long. (R. 753). Claimant indicated he was unable to complete daily tasks or engage in hobbies and was upset because he could no longer work. *Id.* Dr. Shipley prescribed Percocet and Cymbalta for Claimant's pain, but required Claimant to sign a narcotics contract and see a behavioral health specialist, explaining that if he is short on pills or uses illicit drugs he will forfeit his contract. (R. 757). Dr. Shipley also indicated the Cymbalta may help with his insomnia, anxiety, and depression and that she would prescribe clonazepam (Klonopin) for Claimant's insomnia and restless leg syndrome, which Claimant had been treated with in the past, but would research better treatments prior to Claimant's next visit. (R. 755).

The ALJ discussed Dr. Shipley's opinion and afforded it little weight because she had only seen Claimant a few times when she offered her opinion and because she restarted Claimant on narcotic pain medication when numerous other doctors had declined to do so. (R. 19-20). The ALJ appropriately considered the length of treatment relationship and consistency with the record in declining to afford controlling weight to Dr. Shipley's opinion, *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c), and there is substantial evidence in the record to support his decision in this regard.

Dr. Shipley's first encounter with Claimant was on November 16, 2012, in the hospital emergency room, where Claimant presented with low back pain and requested pain medication. (R.

20

758-62). Dr. Shipley noted pain management had administered a facet nerve block to Claimant the previous day that had only lasted approximately five hours, Claimant was frustrated his pain was uncontrolled, and Claimant wished to take medication daily to decrease his pain. (R. 758). Dr. Shipley stated it was unclear why Claimant's primary care provider or pain management had not prescribed narcotics for Claimant. *Id.* Dr. Shipley discharged Claimant with narcotic medication and scheduled Claimant to follow up with her in the primary clinic for pain management. (R. 761-62). It was after Dr. Shipley's next encounter with Claimant, an office visit to establish care on December 11, 2012, that Dr. Shipley provided her opinion with respect to Claimant's limitations. (R. 749-57). Thus, Dr. Shipley had a limited "longitudinal picture" of Claimant's impairments when she offered her opinion, justifying the ALJ's decision to afford it less weight. 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i).

Moreover, Dr. Shipley's March 27, 2013 letter, submitted for the first time to the Appeals Council, does not change this result. The Appeals Council considered Dr. Shipley's letter, but denied review of the ALJ's decision. (R. 1-5). The court must consider evidence submitted to and discounted by the Appeals Council in determining whether substantial evidence supports the ALJ's decision. *See White v. Astrue*, No. 2:08-CV-20-FL, 2009 WL 2135081, at \*2 (E.D.N.C. July 15, 2009) (unpublished) (citing *Wilkins v. Sec'y Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)). "However, evidence submitted after the hearing before the ALJ need only be considered if it is new (i.e. not duplicative of evidence already in the record), material (i.e. there is a reasonable possibility that it would change the outcome), and relates to the period on or before the date of the ALJ's hearing decision." *Id.* (citation omitted). Here, Dr. Shipley's subsequent opinion simply reiterates the earlier restrictions imposed, is unsupported by treatment notes or objective evidence

21

to contradict the substantial evidence cited by the ALJ (as will be discussed in detail below), and relates to Claimant's "current medical state" rather than the period on or before the ALJ's decision. (R. 783). Importantly, it is unclear from Dr. Shipley's letter how many times she treated Claimant or the extent of any subsequent treatment during the roughly three months between her first opinion considered by the ALJ and her subsequent opinion considered by the Appeals Council. Accordingly, the ALJ's decision to afford Dr. Shipley's opinion little weight based on her limited treatment relationship with Claimant is not diminished by the subsequent opinion.

Dr. Shipley's opinion is also inconsistent with other evidence in the record. Although lengthy, a detailed summary of Claimant's treatment history for his chronic back pain, which was thoroughly discussed by the ALJ (R. 17-19), is instructive here. Throughout 2011, Claimant was treated with narcotic medication related to the pain in his right arm and shoulder. *See, e.g.*, (R. 504-07, 518-22). After this problem was resolved by surgery in December of 2011, Claimant was instructed by his neurosurgeon that he had been on pain medication for his shoulder and arm pain and to "be very aggressive and try to get off [his] pain medications[.]" (R. 566). At a January 10, 2012 neurosurgical follow-up appointment, Claimant reported being off pain medication but began experiencing back pain the day prior after twisting his neck. (R. 565). It was noted this was probably a muscle spasm that would go away on its own. *Id.* However, Claimant continued to have back pain and on March 13, 2012, his primary care provider at that time, Dr. Andrea Whitfield, noted he was "adamant about his request for pain medication" and when she declined to prescribe narcotics given his history of dependence, Claimant stated he would "just go to the ER" and "find a new doctor." (R. 713-16). Dr. Whitfield noted an absence of red flags, no indication present to perform imaging of Claimant's back, and ordered physical therapy, which Claimant declined. (R. 715). At

22

this same visit, in relation to his depression, Claimant indicated improved appetite, weight gain, and activity level and stated he had been working odd jobs. (R. 713). On April 5, 2012, Dr. Whitfield saw Claimant related to his "increasing back pain with unclear source; [n]o known trauma/injury" and ordered an MRI, administered a Toradol injection, and declined to prescribe narcotic medication. (R. 706-08).

On April 23, 2012, Claimant visited the pain management clinic, on referral from Dr. Whitfield, related to his low back pain. (R. 661-64). Dr. Johnson noted an MRI from April 12, 2012 revealed mild lumbar spondylosis at L5-S1 and a disk protrusion contacting a nerve root sleeve. (R. 661). Dr. Johnson noted Claimant had a history of being maintained on Percocet for his low back pain, but also had a history of overtaking what was prescribed and recommended lumbar steroid injections in lieu of narcotic medication. (R. 662-64). On May 1, 2012, Dr. Whitfield saw Claimant again related to his back pain, strongly encouraged Claimant to restart Cymbalta (on which Claimant had previously experienced improvement) which he declined, and prescribed a limited number of Oxycodone to bridge the time until his next pain clinic appointment. (R. 701). On May 8 and 23, 2012, Claimant received lumbar steroid injections at the pain clinic and on the second visit it was noted he had been to the emergency room and made several calls requesting pain medication. (R. 656-58). Dr. Furimsky declined to prescribe pain medication, but referred Claimant to Dr. Sharts for a neurosurgical consultation. (R. 656-67). On June 14, 2012, Dr. Furimsky administered a third steroid injection after Claimant reported the second injection "helped a lot" and noted it was not anticipated Claimant would be provided any medications. (R. 594-96).

On July 5, 2012, Claimant saw Dr. Su Fan Vanessa Lin in follow up to a recent hospitalization and with further complaints regarding back pain. (R. 696-99). It was noted that

23

Claimant had been hospitalized after an "unresponsive episode thought to be secondary to narcotic overuse/misuse[.]" (R. 696). Dr. Lin noted Claimant only wanted to discuss his back pain rather than his hospitalization and said he was without a primary care provider because he refused to continue seeing Dr. Whitfield. *Id.* Dr. Lin concluded after reviewing Claimant's chart that he was narcotic dependent and would be prescribed no more narcotics where the risk of harm was greater than the benefit. (R. 696, 698). Claimant was offered Tramadol, Cymbalta, and Gabapentin for his back pain, but declined and was advised to follow up with the pain clinic, Dr. Sharts, and a new primary care provider. (R. 698). On July 23, 2012, Claimant saw Dr. Sharts for a neurosurgical consultation regarding his low back pain. (R. 604). Dr. Sharts indicated Claimant's MRI was "fairly normal with just mild degenerative changes in his lumbar spine, but absolutely no nerve root compression. No instability. Really not even a degenerative disk disease." *Id.* He further noted Claimant had no abnormal motion on flexion or extension and concluded surgery would not be of benefit, recommending continuing pain management and conservative therapies. *Id.*

On August 13, 2012, Claimant established care with Dr. David Baker. (R. 689-93). With respect to Claimant's back pain, it was noted that he was currently off narcotics because no one was prescribing them and he had no significant pathology noted on imaging, no concerning exam findings, and no red flags. (R. 692). Claimant was advised Dr. Baker would not prescribe narcotics and to continue follow up with pain management for his back pain. *Id.* On August 15, 2012, Claimant was seen again by Dr. Johnson at the pain management clinic. (R. 592-93). After summarizing Claimant's treatment, including Dr. Sharts's opinion, Dr. Johnson concluded:

> I do not have good reason to provide him with any type of pain medication as pain complaints seem to be out of proportion with his MRI imaging studies and he has not utilized conservative measures in which at this time we have scheduled an

24

appointment for him to undergo physical therapy with TENS unit training, pool and aqua therapy, as well as pain coping skills.

(R. 593). On August 20, 2012, Claimant saw Dr. Baker in follow up regarding his back pain, indicating he was unhappy with his treatment at the pain management clinic and requesting pain medications. (R. 681-85). Dr. Baker, noting Dr. Johnson's opinion, concluded that Claimant's back pain was "subjectiv[e]ly out of proportion to objective findings." (R. 684). Dr. Baker advised Claimant to follow the pain management clinic's recommendations and offered Claimant other non-narcotic pain medication, which Claimant declined. (R. 685).

Claimant attended physical therapy on August 29 and September 13 and 27, 2012, and indicated he received some relief from the TENS therapy, was shown postural techniques, and was advised to exercise. (R. 768-69). Claimant visited the emergency room on September 21, 2012, after injuring his back hauling a heavy branch while doing yard work. (R. 772). Claimant indicated his back pain was a new problem and was associated with lifting heavy objects. *Id.* He also stated he came to the emergency room because his primary care provider could not see him for two weeks. *Id.* Claimant was discharged with Percocet, Flexeril, and Motrin. (R. 774-75).

On November 15, 2015, Claimant saw Dr. Minard in the pain management clinic and reported the previous lumbar injections provided limited relief. (R. 763). Dr. Minard administered a diagnostic facet medial branch block to explore whether his pain had a "facetal component." (R. 763). He was advised it would only benefit him in a "very transient fashion" and that after receiving the block he should engage in "provoking activities," such as standing and walking, to see if it provided any benefit. (R. 763-64). Claimant was directed to call the following day to discuss the results and was told he could return in two weeks for a "confirmatory injection" if the treatment was

25

beneficial. (R. 764). However, the following day Claimant presented to Dr. Shipley in the emergency room indicating the facet block wore off after five hours and requesting pain medication. (R. 758). It is unclear whether Claimant followed up with the pain management clinic.

Prior to Dr. Shipley, Claimant was treated by several other physicians—Dr. Whitfield, Dr. Johnson, Dr. Furimsky, Dr. Sharts, and Dr. Baker—related to his back pain, all of whom found Claimant's complaints to be out of proportion with the objective evidence, recommended conservative measures, and declined to prescribe him narcotic medication. The extreme limitations imposed in Dr. Shipley's Medical Source Statement are inconsistent with the treatment notes of Claimant's previous providers and are unsupported by objective medical evidence. *See Craig*, 76 F.3d at 590 ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."); *Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted); *Winston v. Colvin*, No. 4:13-CV-221-FL, 2015 WL 450835, at *5-14 (E.D.N.C. Feb. 3, 2015) (unpublished) (adopting memorandum and recommendation finding no error in the ALJ's decision to afford less weight to treating physicians' opinions that were unsupported by and inconsistent with objective medical evidence of record). Accordingly, the ALJ was justified in affording Dr. Shipley's opinion little weight in light of its inconsistency with the other evidence of record.

## C. The ALJ's RFC Analysis

Claimant contends the ALJ erred in determining Claimant can perform a limited range of light work. Pl.'s Mem. [DE-24] at 23-26. Specifically, Claimant relies on the opinions of Dr. Shipley, Claimant's treating psychologist Dr. Dennis Russo, Claimant's own testimony, and the

26

VE's testimony. *Id.* The Commissioner contends the ALJ's decision in this regard is supported by substantial evidence in the record. Def.'s Mem. [DE-26] at 21-23. The undersigned agrees with the Commissioner that the ALJ's RFC is supported by substantial evidence.

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* S.S.R. 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC is based on all relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *see also* S.S.R. 96-8p, 1996 WL 374184, at *5. Where a claimant has numerous impairments, including non-severe impairments, the ALJ must consider their cumulative effect in making a disability determination. 42 U.S.C. § 423(d)(2)(B); *see Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments.") (citations omitted). The ALJ has sufficiently considered the combined effects of a claimant's impairments when each is separately discussed by the ALJ and the ALJ also discusses a claimant's complaints and activities. *Baldwin v. Barnhart*, 444 F. Supp. 2d 457, 465 (E.D.N.C. 2005) (citations omitted). The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." S.S.R. 96-8p, 1996 WL 374184, at *7.

The ALJ determined Claimant had the ability to perform a limited range of light work, requiring him to lift, carry, push and pull 20 pounds occasionally and ten pounds frequently; sit for six hours and stand or walk six hours in an eight-hour workday; have a sit/stand option allowing him

27

to change from sitting to standing every 30 minutes; only occasionally reach overhead with his right upper extremity; and frequently stoop, crouch, kneel, and crawl. (R. 14). Due to Claimant's decrease in the ability to concentrate on and attend to work tasks, the ALJ further limited Claimant to simple, routine, repetitive tasks (i.e., apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form and deal with problems involving several concrete variables in or from standardized situations); only occasional interaction with coworkers, supervisors, and the public; and no complex decision making, constant change, or dealing with crisis situations. *Id.* In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 22).

First, the ALJ did not adopt the restrictions imposed by Dr. Shipley—lifting and carrying no more than ten pounds and walking and standing no more than two hours—that Claimant contends contradict the RFC for a limited range of light work. For the reasons previously discussed, the ALJ did not err in discounting Dr. Shipley's opinion in this regard, where the weight of evidence does not support such restrictions. *See supra* Section V.B. Moreover, as discussed with regard to Listing 1.04, Claimant's latest MRI was characterized as relatively normal by Dr. Sharts, his treatment providers routinely noted negative straight leg raise tests, normal range of motion, normal station and gait, and no difficulty ambulating, and his radiculopathy causing right-arm pain was completely resolved in December 2011. *See supra* Section V.A.1. Likewise, the ALJ was not required to adopt the VE's testimony based on the restrictions imposed by Dr. Shipley (R. 45) where he properly rejected those limitations. *See Farrior v. Astrue*, No. 7:10-CV-164-FL, 2011 WL 3157150, at \*5 (E.D.N.C. July 26, 2011) (unpublished) ("Because the ALJ did not err in assigning the opinion of plaintiff's treating physician 'great' rather than 'controlling' weight, nor did he err by finding

28

plaintiff's complaints not fully credible in light of the other evidence in the record, the court is compelled likewise to reject plaintiff's derivative claim of error in relying on the VE's testimony based on the ALJ's RFC finding.").

Next, the undated opinion of Dr. Russo, submitted to the Appeals Council for the first time, does not undermine the ALJ's RFC analysis. Dr. Russo summarized Claimant's complaints articulated during an unspecified number of sessions, opined that Claimant's chronic sleep difficulty was among his most severe problems, and concluded that as a result of Claimant's injuries, chronic presence of pain, and anxiety, he was unable to reliably manage daily activities or engage in meaningful work. (R. 781-82). The Appeals Council considered Dr. Russo's opinion, but declined review of the ALJ's decision. (R. 1-5). Dr. Russo first saw Claimant on January 15, 2013, almost one year after the ALJ's decision; there are no underlying treatment notes in support of the opinion; and, as discussed with respect to Listings 12.04 and 12.06, the record supports the ALJ's conclusion that Claimant's mental impairments were only moderately limiting. *See supra* Section V.A.2.

Finally, the ALJ appropriately exercised his discretion in discounting Claimant's testimony regarding the severity of his limitations. (R. 22). When assessing a claimant's RFC, it is within the province of the ALJ to determine a claimant's credibility. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984) ("Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight.") (citation omitted). Federal regulations 20 C.F.R. §§ 404.1529(a) and 416.929(a) provide the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 593-94. First, the ALJ must objectively determine whether the claimant

29

has medically documented impairments that could cause his or her alleged symptoms. S.S.R. 96-7p, 1996 WL 374186, at \*2 (July 2, 1996); *Hines v. Barnhart*, 453 F.3d 559, 564 (4th Cir. 2006). If the ALJ makes this first determination, he must then evaluate "the intensity and persistence of the claimant's pain[,] and the extent to which it affects her ability to work," *Craig*, 76 F.3d at 595, and whether the claimant's statements are supported by the objective medical record. S.S.R. 96-7p, 1996 WL 374186, at \*2; *Hines*, 453 F.3d at 564-65. Objective medical evidence may not capture the full extent of a claimant's symptoms, so where the objective medical evidence and subjective complaints are at odds, the ALJ should consider all factors "concerning the individual's functional limitations and restrictions due to pain and other symptoms." S.S.R. 96-7p, 1996 WL 374186, at \*3 (showing the complete list of factors). The ALJ may not discredit a claimant solely because his or her subjective complaints are not supported by objective medical evidence. *See Craig*, 76 F.3d at 595-96. But neither is the ALJ required to accept the claimant's statements at face value; rather, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." S.S.R. 96-7p, 1996 WL 374186, at \*2; *see also Taylor v. Astrue*, No. 5:10-CV-263-FL, 2011 WL 1599679, at \*4-8 (E.D.N.C. Mar. 23, 2011) (unpublished) (finding the ALJ properly considered the entire case record to determine that claimant's subjective complaints of pain were not entirely credible), *adopted by* 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

Claimant testified to totally disabling back pain, as well as depression, anxiety, memory loss, lack of concentration, insomnia, and fatigue. (R. 35-42). The ALJ considered Claimant's testimony (R. 14-15), but found the extreme limitations to which he testified were unsupported by the record. (R. 15-22). As previously discussed, the ALJ noted the lack of objective evidence supporting Claimant's allegations of disabling back pain, that Claimant stopped taking Cymbalta after indicating

30

it helped his mood and pain, declined other antidepressant medications and psychotherapy, was not interested in learning relaxation and pain coping skills, and was assessed with a GAF score reflecting moderate symptoms. *Id.*; *see supra* Section V.A. Further, as noted above, there is evidence in the record that Claimant engaged in a greater level of daily activity than his testimony suggests. *See* (R. 439) (Oct. 24, 2010 - ED visit due to Claimant twisting his ankle playing basketball); (R. 713) (Mar. 13, 2012 - Claimant reported to his treating physician that he was feeling better regarding his depression and had been "working some odd jobs lately"); (R. 772) (Sept. 21, 2012 - ED visit due to Claimant twisting his back hauling a heavy branch while doing yard work). The ALJ also noted that only conservative treatment had been recommended by Claimant's treatment providers. (R. 18); *Dunn v. Colvin*, No. 14-1565, 2015 WL 3451568, at *10 (4th Cir. June 1, 2015) (unpublished) (finding it "well established in this circuit that the ALJ can consider the conservative nature of a claimant's treatment in making a credibility determination," and explaining "if all that the claimant needs is conservative treatment, it is reasonable for an ALJ to find that the alleged disability is not as bad as the claimant says that it is."). In sum, the ALJ acknowledged Claimant has some pain, depression, and anxiety and limitations related thereto, but appropriately determined based on substantial evidence in the record that Claimant was capable of a limited range of light work.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-23] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-25] be ALLOWED and the final decision of the Commissioner be UPHELD.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **August 4, 2015** to file

31

written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

SUBMITTED, this the $\underline{21}$ day of July 2015.

Robert B. Jones, Jr.
United States Magistrate Judge

32